## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JOE RAY GALLEGOS,

     Plaintiff,

v.                                                                    Civ. No. 15-764 MCA/GJF

CAROLYN COLVIN, Acting
Commissioner of the Social Security
Administration,

     Defendant.

## PROPOSED FINDINGS AND
## RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Plaintiff's "Motion to Reverse or Remand Administrative Agency Decision" ("Motion"), filed on April 13, 2016.  Doc. No. 17.  The Commissioner responded on July 29, 2016.  Doc. No. 24.  Plaintiff replied on August 12, 2016.  Doc. No. 26.  On October 6, 2016, U.S. Chief District Judge M. Christina Armijo referred the above-captioned cause to the undersigned for recommended findings and disposition.  Doc. No. 28.  Having meticulously reviewed the entire record and the parties' pleadings, the Court **RECOMMENDS** that Plaintiff's Motion be **GRANTED IN PART** and **DENIED IN PART**.  The Court further **RECOMMENDS** that the matter be remanded for the limited reason set forth herein.

## I.    BACKGROUND

Plaintiff was born on February 20, 1976, and graduated high school from Mountainair, New Mexico, where he attended special education classes.  Administrative R. ("AR") 48, 357, Doc. No. 15.  Despite receiving his high school diploma, Plaintiff is illiterate.  AR 357.

Plaintiff has worked as a general laborer throughout his life.  AR 48.  His responsibilities have included sweeping, mopping, and other janitorial duties at construction sites.  AR 48-49.  For a time, he was also self-employed, where he "clean[ed] yards."  AR 49.  Plaintiff stopped working in 2009 following a workplace accident in which he fell from a ladder and injured his back.  AR 48.

Plaintiff filed an application for Disability Insurance Benefits ("DIB") under Title II, Sections 216 and 223 of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423 (2012), alleging disability beginning in April 2009 due to depression, mood swings, inability to read or write, and hepatitis C.  AR 200-01, 227.  The Social Security Administration ("SSA") denied Plaintiff's application initially and upon reconsideration.  AR 121-25, 131-33.  At his request, Plaintiff received a *de novo* hearing before Administrative Law Judge ("ALJ") Ann Farris on September 24, 2013, at which Plaintiff, his legal counsel, and a vocational expert ("VE") appeared.  AR 42-76.  On January 6, 2014, the ALJ issued her decision, finding that Plaintiff was not disabled within the meaning of the Act.  AR 24-37.  The SSA's Appeals Council declined review on May 5, 2015.  AR 1-5.  As a consequence, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 422.210(a) (2015).

Plaintiff timely filed his appeal with the U.S. District Court on August 28, 2015.  Doc. No. 1.

## II.   PLAINTIFF'S CLAIMS

Plaintiff advances five grounds for relief.  First, he argues that the ALJ failed to properly weigh the opinion of Dr. Barbara May-Valencia, a consultative examining psychologist.  Pl.'s Mot. 9, Doc. No. 17.  Second, he contends the ALJ erred by not finding that he met the listing criteria for intellectual disability under Listing 12.05.  *Id.* at 12-15.  Third, he alleges the ALJ

failed to incorporate moderate limitations found by numerous physicians into his residual functional capacity ("RFC") finding.  *Id.* at 16-17.  Fourth, he claims the ALJ improperly evaluated the third party statements of his wife.  *Id.* at 18-19.  Lastly, he avers that the ALJ's "step five" finding that Plaintiff can still perform work that exists in significant numbers in the national economy is not supported by substantial evidence.  *Id.* at 20-22.

## III.   APPLICABLE LAW

### A.  Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision becomes the final decision of the agency.[1]  The Court's review of that final agency decision is both factual and legal.  *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.")

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.  Substantial evidence does not, however, require a preponderance of the

---

[1] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. § 404.981 (2015); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

evidence. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court reviews "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084. The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

**B. Sequential Evaluation Process**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2015). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e). In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the

functional requirements of his past relevant work to determine if the claimant is still capable of performing his past work.  *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).   The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).  If the claimant cannot return to his past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy.  *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.    THE ALJ'S DECISION

The ALJ issued her decision on January 6, 2014.  AR 47.  At step one, she found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of April 22, 2009.  AR 26.  Because Plaintiff had not engaged in substantial gainful activity for at least twelve months, the ALJ proceeded to step two.  AR 35-38.  There, she found that Plaintiff suffered from the following severe impairments: (1) polysubstance abuse; (2) hepatitis C; (3) left knee pain; (4) a major depressive disorder; (5) anti-social personality disorder; and (6) a learning disorder.  AR 26.  In tandem with these findings, the ALJ found Plaintiff's back and elbow conditions to be non-severe and provided her rationale for finding them so.  AR 27.

At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled the severity of a Listing.  AR 27-30.  This finding included an analysis of Plaintiff's mental impairments, which the ALJ found did "not meet or

medically equal the criteria of Listing Sections 12.04 (*Affective Disorders*) and/or 12.08 (*Personality Disorders*)."[2]  AR 27 (emphasis in original).

The ALJ found that the paragraph B criteria[3] of Listing 12.04 were not met "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  AR 28.  She then explained her reasoning regarding the Listing's four subparts, beginning with activities of daily living.  There, the ALJ found Plaintiff to have only a mild restriction.  Among other things, the ALJ observed that Plaintiff "goes out with his wife . . . watches television, helps her fold clothes, and cleans the yard when he can."  AR 28.  Additionally, she noted that Plaintiff could perform various light household chores, go out for groceries, and care for both his children and cats when assisted by his wife.  AR 28.  As to social functioning, the ALJ found that Plaintiff had moderate difficulties.  She noted Plaintiff's struggle with thinking "people talk about him" based on his illiteracy, along with the fact that he does not go out and socialize on a regular basis.  AR 28.  She tempered the observation, however, by noting that Plaintiff does go out with other people, albeit rarely, and also attends church weekly.  AR 28.  The ALJ similarly found Plaintiff to have moderate difficulties with concentration, persistence, and pace.  To support the finding, the ALJ cited the report of Dr. May-Valencia, which stated that Plaintiff's ability to "sustain attention concentration and mental control is in the extremely low range," but

---

[2] Although Listing 12.04 and 12.08 are similar in their paragraph B criteria, they are not identical.  The ALJ's later examination of Listing 12.04 does not serve as an analysis of Listing 12.08 criteria.

[3] Paragraph B in Listing 12.04 describes impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations must be the result of the mental disorder described in the diagnostic description.  To meet this Listing, a claimant must exhibit at least two of the following:
      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04(B).

nonetheless concluded that Plaintiff "was able to understand and remember simple instructions." AR 28 (citations omitted).   In addition, the ALJ referenced the testimony of Plaintiff's wife, who attested that Plaintiff "finishes what he starts" and that he is "able to follow spoken instruction somewhat ok," but does not really understand.   AR 28 (citations and internal quotation marks omitted).   The ALJ concluded her paragraph B discussion by finding that Plaintiff "has experienced no episodes of decompensation."  AR 28.

The ALJ similarly found that the evidence in Plaintiff's case "fails to establish the presence of 'paragraph C' criteria."[4]  AR 28.  She based her finding on the lack of "evidence of attenuation of symptoms with repeated episodes of decompensation, a residual disease process resulting in marginal adjustment, or a current history of one or more years' inability to function outside of a highly supportive living arrangement."  AR 28.

After finding that Plaintiff did not meet the criteria for Listing 12.04, the ALJ also evaluated Plaintiff's claim under Listing 12.05[5] for intellectual disability.   She began by

---

[4] Paragraph C in Listing 12.04 describes impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations must be the result of the mental disorder described in the diagnostic description, and must be supported by medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1.   Repeated episodes of decompensation, each of extended duration;
2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.   Current history of 1 or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.* § 12.04(C).

[5] Under Listing 12.05, intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.  These requirements are as follows:
A.   Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
B.   A valid verbal, performance, or full scale IQ of 59 or less;

explaining that Plaintiff did not meet paragraph A, as he had not demonstrated that he was dependent upon others for personal needs.  Next, the ALJ found that Plaintiff did not meet paragraph B, as his IQ was not 59 or less. Turning to paragraphs C and D, the ALJ found "they are not met because [Plaintiff's] adaptive functioning does not support a finding of mental retardation in this case."[6]  AR 29.  The ALJ reasoned that "Dr. Valencia diagnosed [Plaintiff] with a learning disorder and not mental retardation."  AR 29.  Furthermore, she referenced Dr. Valencia's observations that Plaintiff was "able to understand and remember simple instructions," and that he "performed much better on non-verbal than on verbal reasoning tasks." AR 29 (citations omitted).  Additionally, the ALJ found it persuasive that Plaintiff "graduate[d] from high school," "has had many construction jobs," and that he could "fix cars and do home repairs before his alleged onset date."  AR 29 (citation omitted).  In sum, because Plaintiff's "level of adaptive functioning does not support a diagnosis of mental retardation," the ALJ held that Plaintiff did not meet or medically equal Listing 12.05.  AR 29-30.

Because none of Plaintiff's impairments satisfied an applicable Listing, the ALJ went on to assess Plaintiff's RFC.  AR 39-45.  "After careful consideration of the record," the ALJ determined that Plaintiff could:

> perform light work as defined in [20 C.F.R. § 404.1567(b) (2015)] except that he should not be required to kneel, crouch, or crawl; he should not be required to walk on uneven ground but has no limitations for walking on

---

C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

D.   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
  1.   Marked restriction of activities of daily living;
  2.   Marked difficulties in maintaining social functioning;
  3.   Marked difficulties in maintaining concentration, persistence, or pace; or
  4.   Repeated episodes of decompensation, each of extended duration.

*Id.* § 12.05.

[6] *See infra*, section IV(B).  The ALJ's grounds for disqualifying Plaintiff from Listing 12.05(C) clearly concerned his satisfaction of the Listing 12.05 capsule criteria, rather than a subrequirement within 12.05(C).

> even surfaces; he is able to perform simple, routine tasks with reasoning
> level 1; he should have no interaction with the public and only occasional,
> superficial interaction with co-workers; and he should not be required to
> read instructions or write reports.

AR 30.  In reaching this conclusion, the ALJ accorded significant weight to examining physician Gregory E. McCarthy, M.D., who opined that Plaintiff "would be able to walk short and long distances on even terrain but may have difficulty walking short and long distances on uneven terrain."  AR 33.  Furthermore, Dr. McCarthy believed that Plaintiff "would be able to lift and carry 10 to 20 pounds on an occasional basis," but that he "had some difficulties with bending, stooping, and crouching mainly due to his left knee complaint and lack of range of motion on the examination."   AR 33.   The ALJ also assigned significant weight to state agency medical consultant Dr. Janice Kando, M.D., but exceeded Dr. Kando's suggested restrictions by assigning "additional limitations consisting of inability to kneel, crouch, and crawl and walk on uneven surfaces."   AR 33-34.   Lastly, the ALJ ascribed significant weight to state agency psychiatric consultant Scott R. Walker, M.D., who concluded that Plaintiff "can understand, remember, and carry out simple instructions; make simple decisions; attend and concentrate for two hours at a time; interact adequately with co-workers and supervisors; and respond appropriately to changes in a routine work setting."  AR 34 (citation omitted).

At step four, the ALJ found that Plaintiff could not perform any past relevant work, as his previous employment had been "heavy work as a yard work laborer."  AR 35. Accordingly, the ALJ proceeded to step five.  Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff could perform other jobs that exist in significant numbers in the national economy.  AR 35-37.  These jobs, as described by Ms. Mary Weber, the VE, included garment bagger, garment folder, and metal cleaner and polisher.  AR 36.  Finally, the ALJ found that

Plaintiff had not been under a disability, as defined by the Act, during the relevant time period, and she denied the claim.  AR 37.

## V.    ANALYSIS

As set forth below, Plaintiff fails to marshal sufficient support from facts or case law in his first four allegations of error to establish that the ALJ either applied incorrect legal standards or that her decision is unsupported by substantial evidence.  His fifth claim, however, bears at least some merit and demonstrates that the ALJ found significant numbers of jobs to exist in the national economy without substantial evidence.   Accordingly, the undersigned recommends remanding the ALJ's decision on that basis alone.  The Court's reasoning as to each of Plaintiff's claims will be discussed *seriatim*.

### A. The ALJ's Failure to Assign Weight to Dr. May-Valencia's Opinion Did Not Prejudice Plaintiff

Plaintiff begins by claiming that "ALJ Farris failed to weigh the opinion of 96-6p consultative examining psychologist Dr. May-Valencia, PhD."  Pl.'s Mot. 9.  He explains that "Dr. May-Valencia diagnosed [Plaintiff] as having major depressive disorder, learning disorder, and anti-social personality disorder."   *Id.* (citation omitted).   Furthermore, he opines that Dr. May-Valencia performed tests on Plaintiff that established his "general cognitive ability [to be] within the extremely low range of intellectual functioning" with an IQ as low as 65.  *Id.* (citation omitted).   Yet, he contends that "[n]owhere does ALJ Farris actually assign weight to Dr. May-Valencia's opinion."  *Id*. at 10.  Moreover, he complains that the ALJ failed to "explain how the non-examining opinions were credited over that of the examiner," and that "failure to properly weigh opinion evidence from an examining expert is harmful and reversible error."  *Id.*

The Commissioner responds that "Plaintiff has failed to demonstrate that Dr. May-Valencia rendered any opinions regarding Plaintiff's mental residual functional capacity (MRFC)

10

that the ALJ failed to account for in her RFC finding."  Def.'s Resp. 4, Doc. No. 24.  Instead, she

argues that the findings Plaintiff cites to in his Motion are from Dr. May-Valencia's diagnostic

testing, not from an opinion she rendered.  *Id.* (citing Pl.'s Mot. 9).   Additionally, the

Commissioner notes that Dr. May-Valencia "did not opine that Plaintiff would be incapable of

simple, routine work (such as he had performed in the past notwithstanding his learning disorder)

or that he was unable to perform the type of work outlined in the ALJ's RFC finding."  *Id.*

Ultimately, because she believes "there are no medical opinions from Dr. May-Valencia that the

ALJ should have weighed," the Commissioner asserts that "there was no error."  *Id.*

On this claim, both parties' arguments fall short.  First, the Commissioner is incorrect in

asserting that Dr. May-Valencia did not formulate opinions for the ALJ to weigh.  The governing

regulations require that "[r]egardless of its source," the ALJ "will evaluate every medical

opinion" received.  20 C.F.R. § 404.1527(c) (2016).  The regulations define medical opinions as

"statements from physicians and psychologists or other acceptable medical sources that reflect

judgments about the nature and severity of your impairment(s), including your symptoms,

diagnosis and prognosis, what you can still do despite impairment(s), and your physical or

mental restrictions."  *Id.* § 404.1527(a)(2).  Although ALJs are "not bound by findings made by

State agency or other program physicians and psychologist," Ruling 96-6p clarifies that ALJs

"may not ignore these opinions and must explain the weight given to the opinions in their

decisions."  SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996).  Here, Dr. May-Valencia made

*numerous* statements concerning the nature and severity of Plaintiff's mental impairments, along

with diagnoses and prognoses, and estimations of what Plaintiff could do notwithstanding his

deficits.  The mere fact these were not adduced on a "check the appropriate box" form does not

make them any less of a medical opinion.  The Commissioner's position on this issue is contrary to regulation and the Commissioner's own Rulings, and as such, clearly fails.

Plaintiff's position is equally untenable.  Fundamentally, he contends that ALJ Farris improvidently discounted Dr. May-Valencia's opinion, and that this error was terminal to his case, "as the limitations assessed by Dr. May-Valencia would have precluded [Plaintiff] from competitive employment."  Pl.'s Mot. 11.  Plaintiff relies on the following observation by the ALJ to support this point: "Dr. Valencia further stated that once the claimant's mental health symptoms are effectively managed, he may benefit from vocational rehabilitation to assist him in developing a marketable job skill set that he can deal with emotionally and physically."  AR 33. From this one sentence, Plaintiff infers the following: (1) that the ALJ impermissibly substituted her judgment for that of a medical professional, Pl.'s Mot. 10; (2) that the ALJ implicitly discredited the opinion of Dr. May-Valencia, *id.*; and (3) that the ALJ relied on this mischaracterization of Plaintiff's social, emotional, and cognitive potential to *reject* Dr. May-Valencia's statements.  *Id.* at 11.  The ALJ did none of these things, as she drew her observation nearly *verbatim* from Dr. May-Valencia's report, which stated, "Once mental health symptoms are more effectively managed, [Plaintiff] may benefit from vocational rehabilitation counseling to assist him to develop a marketable job skill set that he can deal with emotionally and physically."  AR 359.

The only actual question for the Court to determine is whether the ALJ's failure to assign weight to Dr. May-Valencia's opinion caused Plaintiff harm as a matter of law.  Based on Tenth Circuit precedent, the Court finds that Plaintiff did not suffer prejudice, as according some greater weight to Dr. May-Valencia's opinion would not have assisted him in achieving his desired disability determination.  *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th

Cir. 2012) (failure to assign weight to a medical opinion was harmless where according the opinion a greater weight would not have assisted the claimant).   Rather, Dr. May-Valencia's findings are consistent with the ultimate RFC assigned by the ALJ, which in relevant part, provides that Plaintiff "is able to perform, simple, routine tasks with reasoning level 1;[7] [and] he should have no interaction with the public and only occasional, superficial interaction with co-workers."  AR 30.  Dr. May-Valencia's report echoes the RFC, finding that Plaintiff is "able to understand and remember simple instructions."  AR 359.  The ability to understand and remember simple instructions is consistent with DOT Reasoning Level 1, which requires individuals to "[a]pply commonsense understanding to carry out simple one or two-step instructions."  DOT, App. C, 1991 WL 688702.  Additionally, Dr. May-Valencia's diagnostic impression of Plaintiff as having antisocial personality disorder, AR 359, is consistent with the ALJ's restrictions on Plaintiff's interactions with co-workers.   As a consequence, the undersigned finds that Plaintiff suffered no prejudice from the ALJ's failure to assign weight to the opinion of Dr. May-Valencia, and therefore, recommends that this claim be denied.

### B. The ALJ Properly Found That Plaintiff's Impairments Did Not Equal or Meet Listing 12.05

Next, Plaintiff contends that the ALJ erred at step three by not finding that his mental impairments met or exceeded the criteria for Listing 12.05(C).  Pl.'s Mot. 12-15.  From the

---

[7] The Dictionary of Occupational Titles ("DOT") identifies a level of General Educational Development which embraces aspects of formal and informal education required of the worker for satisfactory job performance.  DOT, App. C, 1991 WL 688702. One area addressed is "reasoning development."  The DOT assigns each occupation a "reasoning level" which is rated from one (lowest level) to six (highest level).  *Id.*  Reasoning level one is defined as:

> Reasoning Level 1—Apply commonsense understanding to carry out simple one or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

*Id.*

outset, Plaintiff acknowledges that, to satisfy the severity criteria of Listing 12.05, a claimant must meet *both* the capsule definition of intellectual disability *and* the conditions of either paragraphs A, B, C, or D.  *Id.* at 12.  Specifically, as to Listing 12.05(C), he further stipulates that in addition to meeting the capsule definition for intellectual disability, a claimant must demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at 12-13.  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).

Concessions aside, Plaintiff maintains that the ALJ misapplied Listing 12.05(C) in two separate respects.  First, he contends that the ALJ erroneously disqualified him from paragraph C by discounting his IQ score of 65 relative to his adaptive functioning.  Pl.'s Mot. 13-14.  Additionally, Plaintiff argues that "with respect to the capsule definition of [L]isting 12.05, [Plaintiff] has demonstrated that his learning disability, while not initially disabling, was manifested well before age 22."  *Id.* at 15 (internal quotation marks omitted).  By Plaintiff's estimation, his work experience as a general laborer and yard worker "'create[s] a rebuttable presumption of a fairly constant IQ through [his] life,' which is not rebutted by his unskilled work experience and highly dependent daily activities."  *Id.* (quoting *Hodges v. Barnhart,* 276 F.3d 1265, 1268 (11th Cir. 2001)).

The Commissioner responds by alleging that Plaintiff has stressed his satisfaction of paragraph C criteria while "entirely ignor[ing] the capsule definition for Listing 12.05C."  Def.'s Resp. 5.  She explains that "[t]he ALJ clearly found that Plaintiff did not meet this capsule definition because he did not have the requisite deficits in adaptive functioning, and therefore, she was not required to assess whether Plaintiff met or medically equaled the requirements of paragraphs A through D."  *Id.*  The Commissioner further emphasizes that the ALJ considered

Plaintiff's graduation from high school, his diagnosis of a learning disorder, and statements by Plaintiff's wife that he could pay bills, work on his car, and do home repairs. *Id.* at 5-6. In the aggregate, the Commissioner avers that these findings provide a sufficient basis for the ALJ to conclude that Plaintiff did not meet the capsule definition of Listing 12.05. *Id.* at 6.

For a second time in this litigation, both parties' arguments appear to have missed the mark. Yet, in this instance, the blame for that failure is more appropriately ascribed to the ALJ, whose 12.05(C) analysis is muddled, to say the least. That confusion projects from the beginning of her analysis, where she states that she has considered Plaintiff's "learning disorder under the requirements of listing 12.05 (*Mental retardation*)." AR 29. She then defines the term "mental retardation" as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." AR 29. Unfortunately, the mere use of this arcane terminology has served to confuse the issues.

The ALJ supports her 12.05(C) finding by referencing Dr. May-Valencia's diagnosis of Plaintiff as having a learning disorder NOS,[8] rather than mental retardation. In so doing, the ALJ draws an objection from Plaintiff, who notes that mental retardation "is no longer a diagnosis used by *any* healthcare professional." Pl.'s Reply 3, Doc. No. 26. Although the Court need not ratify such a broad statement, the law is clear that as of September 3, 2013, the Social Security Administration finalized the promulgation of a rule that replaced the term "mental retardation" with "intellectual disability" throughout its governing regulations and the Listings of Impairments. 78 Fed. Reg. 46,449 (Sep. 3, 2013) (codified at 20 C.F.R. §§ 404, 416). The Court recognizes that the ALJ's decision in the instant matter was handed down only three months after the rule was finalized, but her failure to take notice of the rule change has somewhat impeded

---

[8] NOS is an abbreviation for "not otherwise specified."

this Court's ability to perform a meaningful review.  Even so, the ALJ's reliance on Dr. May-Valencia's diagnosis of a learning disorder, rather than *intellectual disability*, was proper, and constitutes part of the substantial evidence supporting her 12.05(C) finding.

The structure of the ALJ's 12.05(C) analysis further complicates the issues.  First, she holds that Plaintiff meets neither Listing 12.05(C) or (D) because his "adaptive functioning does not support a finding of mental retardation in this case."  AR 29.  But, rather than transitioning to a discussion of how Plaintiff does not meet the capsule definition for Listing 12.05 – which would disqualify him from both section (C) and (D) – she diverts into a recitation of Listing 12.00(D)(6) that implies her holding might rest on her opinion of Plaintiff's tested IQ score.  AR 29.  In fact, this diversion leads Plaintiff to allege that the ALJ's "attempt to minimize the significance of the 'extremely low' mental examination scores assessed by Dr. May-Valencia, which meet the listing criteria, has no basis in either the regulations or the administrative record."  Pl.'s Mot. 14.  This argument, however, ignores the ALJ's dispositive holding that Plaintiff's "overall adaptive functioning and the record as a whole are not consistent with a finding of mental retardation."  AR 29.  The Commissioner appropriately notes that "[t]he ALJ clearly found that Plaintiff did not meet [the] capsule definition because he did not have the requisite deficits in adaptive functioning, and therefore, she was not required to assess whether Plaintiff met or medically equaled the requirements of paragraphs A through D."  Def.'s Resp. 5.  Had the ALJ not proceeded to assess Plaintiff's eligibility under each of the four paragraphs, the burden on the parties and this Court would have been diminished, since her opinion makes clear that she finds Plaintiff to not meet the capsule definition of Listing 12.05.

To satisfy the capsule definition of intellectual disability, a claimant must demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning

16

initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.05. The ALJ found that Plaintiff had not demonstrated the capsule definition criteria, and supported that finding with the following facts: (1) Dr. May-Valencia's diagnosis of Plaintiff with a learning disorder NOS rather than mental retardation (intellectual disability); (2) Plaintiff's significant work history in the construction business; (3) Plaintiff's ability to understand and remember simple instructions during his examination with Dr. May-Valencia; (4) Plaintiff's graduation from high school, albeit in special education classes; and (5) Plaintiff's ability to work on cars and do home repairs before the alleged onset date.[9] AR 29. This evidence, standing alone, does not decisively disprove Plaintiff's satisfaction of the Listing 12.05 capsule criteria. To the contrary, this question is clearly a close call. Even so, the ALJ's reliance on these bases was not "clearly erroneous," nor were her 12.05(C) findings "unsupported by substantial evidence of record," as Plaintiff claims. Pl.'s Mot. 15. Under the deferential standard applicable here, the ALJ need only support her findings with "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. In this instance, she has done so. In fact, her evidentiary bases find support in Tenth Circuit case law, where it has been expressly stated that a claimant's work history "is highly probative of his cognitive abilities." *See Harold v. Astrue*, 299 F. App'x 783, 788 (10th Cir. 2008) (unpublished). Moreover, the Tenth Circuit has found it proper for an ALJ to consider evidence after claimants reach age 22 to establish the required deficits in adaptive functioning. *See Crane v. Astrue*, 369 F. App'x 915, 921-22 (10th Cir. 2010) (unpublished). Accordingly, under the relevant, deferential standard of

---

[9] The ALJ also supported her finding by noting that Plaintiff can pay bills, count change, handle a savings account, and manage a checkbook. AR 29. These facts derived from a form filled out by Plaintiff's wife. Under oath, his wife testified that Plaintiff is actually not able to pay bills without his wife's help, or maintain a checkbook. Pl.'s Reply 5, Doc. No. 26. Disregarding these facts, the ALJ's finding under Listing 12.05(C) is still supported by substantial evidence.

these proceedings, the undersigned finds that the ALJ applied the proper legal standards in crafting her 12.05(C) analysis and supported her decision with substantial evidence, and therefore, recommends that the presiding judge deny this claim.

### C.  The ALJ Did Not Improperly Fail to Include Moderate Physical Limitations

Third, Plaintiff argues that the ALJ did not include in her RFC finding some of the limitations identified by consulting and non-examining state agency physicians.  Pl.'s Mot. 16-18.  First, Plaintiff asserts that the ALJ's RFC determination omitted the limitation assigned by Dr. McCarthy and Dr. Kando, two non-examining agency physicians, regarding stooping or bending without explanation.  *Id.* at 16-17.  In addition, Plaintiff alleges that the ALJ failed to include in her RFC Dr. Walker's limitation regarding Plaintiff's interaction with supervisors.  *Id.* at 17.  By Plaintiff's estimation, these errors were "harmful and reversible, as a more restrictive RFC assessment would have necessitated a different result."  *Id.* at 18.

The Commissioner responds to the two challenges in turn.  As to Dr. McCarthy and Dr. Kando's limitation on bending and stooping, she opines that "[t]here is absolutely no support in the record for a finding that Plaintiff would have difficulty bending or stooping, which both involve movement of the spine, and Dr. McCarthy's physical examination showed excellent muscle strength, no tenderness or decreased range of motion in Plaintiff's back, and negative straight leg raising."  Def.'s Resp. 4.  Turning to Dr. Walker's purported limitation, she explains that "Dr. Walker did not opine that Plaintiff was unable to interact with supervisors. Rather, he specifically stated that Plaintiff could 'interact adequately' with supervisors and co-workers."  *Id.* at 5.  On both accounts, the Commissioner avers that "the ALJ did not err."  *Id.*

Although ALJs are not required to discuss every piece of evidence, they are required to discuss the weight assigned to each medical source opinion.  *Keyes-Zachary*, 695 F.3d at 1161

(citing 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii)).   Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why.   SSR 96-5p, 1996 WL 374183 at *5 (July 2, 1996).   "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on [a specific] functional capacity . . . [because] the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."   *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and internal quotation marks omitted)).   Nevertheless, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."   *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).

### 1.   Dr. McCarthy and Dr. Kando

Here, the ALJ assigned "significant weight" to Dr. McCarthy's functional assessment, finding it "consistent with the record as a whole, including the scarcity of objective medical findings, the claimant's daily activities, and his own statements of what he can do."  AR 33.  As part of that functional assessment, on August 27, 2011, Dr. McCarthy performed an examination of Plaintiff's spine and extremities.  AR 354.  The results of that examination were as follows:

> *Spine nontender to palpation over cervical, thoracic, and lumbar vertebral bodies.* Pulses are palpable in both upper and lower extremities. No clubbing, cyanosis, or edema noted.  Gait is normal without assistive device.   Grip strength 5/5 for both hands. Range of motion of the following joints are normal bilaterally: Elbows, forearms, wrists, shoulders, hips, and ankles. Range of motion of the right knee is normal. Range of motion of the left knee limited to 120 degrees.  Straight leg raise is negative sitting and supine.  [Plaintiff] was able to walk on his heels, walk on his tiptoes, and perform the heel-to-toe tandem gait without difficulties.   *[Plaintiff] had some difficulties squatting, only able to squat three quarters of a squat holding onto the exam table. This is thought to be due to his knee pain.* There were calluses noted on both hands.

AR 354 (emphasis added).   Based on his observations, Dr. McCarthy opined that "[g]iven today's evaluation and solely based on this, it appears that he has some difficulties bending,

stooping, and crouching *mainly due to his left knee complaints and lack of range of motion on exam*." AR 355.

On September 15, 2011, Dr. Kando reviewed Plaintiff's records and made her own recommendation on Plaintiff's RFC. AR 105-107. Looking at Dr. McCarthy's examination notes in tandem with Plaintiff's medical file, she too opined that Plaintiff could stoop, kneel, crouch, or crawl only occasionally. AR 106. The ALJ assigned "significant weight" to Dr. Kando's evaluation, as she found "it is generally consistent with the record as a whole, including objective medical findings, the claimant's own statements of his abilities, and his daily activities." AR 34.

After reviewing the record as a whole, the ALJ found in relevant part that Plaintiff had the residual functional capacity to "perform light work as defined in 20 CFR 404.1567(b) except that he should not be required to kneel, crouch, or crawl; he should not be required to walk on uneven ground but has no limitations for walking on even surfaces." AR 30. This RFC finding is supported by, rather than in conflict with, the opinions of both Dr. McCarthy and Dr. Kando. Indeed, SSA Rulings clarify that "[t]he lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping." SSR 83-10, 1983 WL 31251, at *6 (Aug. 20, 1980). The SSA's Program Operations Manual System ("POMS") reinforces this position, stating that "[o]nly occasional stooping and no crouching is required to perform most sedentary and light occupations." POMS § DI 25020.005(A)(9)(d). Therefore, by limiting Plaintiff to light work, the ALJ incorporated Dr. McCarthy and Dr. Kando's recommendations that Plaintiff only "occasionally" stoop. Furthermore, the ALJ expanded their recommended limitations on kneeling, crouching, or crawling by forbidding Plaintiff from these activities.

Thus, it cannot be said that the ALJ committed error by failing to incorporate Dr. McCarthy or Dr. Kando's exertional limitations.  This argument must fail.

### 2.  Dr. Walker

 Plaintiff similarly alleges that the ALJ failed to include in her RFC finding Dr. Walker's limitation regarding his ability to interact with supervisors.  Pl.'s Mot. 17.  He introduces the challenge in his Motion, where he asserts that "ALJ Farris did not mention interaction with supervisors" in her RFC finding.  *Id.* (emphasis omitted).  Plaintiff further explains, through his Reply, that "Dr. Walker did opine, and did not qualify, that Plaintiff had moderate limitation[s] accepting instructions."  Pl.'s Reply 7. The Commissioner responds that "Dr. Walker did not opine that Plaintiff was unable to interact with supervisors."  Def.'s Resp. 5.  Instead, the Commissioner highlights Dr. Walker's finding that Plaintiff could "interact adequately" with supervisors and co-workers."  *Id.*  Moreover, she posits that the ALJ not only incorporated Dr. Walker's recommendations, "but limited Plaintiff further by restricting his interaction with co-workers."  *Id.*

The recommendation in question involves two related findings.  Dr. Walker's first relevant observation states that Plaintiff was "moderately limited" in his "ability to accept instructions and respond appropriately to supervisors."  AR 86.  Yet, when offered the opportunity to elaborate in the "MRFC – Additional Explanation" section, Dr. Walker clarified that Plaintiff "can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, *interact adequately with co-workers and supervisors*, and respond appropriately to changes in a routine work setting."  AR 87 (emphasis added).   The ALJ integrated this narrative finding into Plaintiff's ultimate RFC, which provided that "he is able to perform simple, routine tasks with reasoning level 1," but she

also additionally restricted Plaintiff by holding he "should have no interaction with the public and only occasional, superficial interaction with co-workers." AR 30.

Neither the ALJ's opinion nor Dr. Walker's own narrative mention Dr. Walker's moderate limitation concerning Plaintiff's interaction with supervisors. Nevertheless, the ALJ committed no error, as the Tenth Circuit's decision in *Smith v. Colvin* makes clear that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." 821 F.3d 1264, 1269 (10th Cir. 2016) (citing *Vigil v. Colvin* 805 F.3d 1199, 1204 (10th Cir. 2015)). In fact, in *Smith*, the non-examining state physician assessed the same "moderate limitation" in the claimant's ability to "accept instructions and respond appropriately to criticism by supervisors." *Id.* at 1268. But, in her RFC narrative, she too omitted that limitation and recommended instead that the claimant "could (1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ adopted the recommendation, and found that the claimant "(1) could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks." *Id.* at 1269. "Through these findings," the Tenth Circuit held that "the [ALJ] incorporated the functional limitations of [the claimant's] moderate nonexertional limitations." *Id.* The *Smith* court reasoned that the "notations of moderate limitations served only to aid [the physician's] assessment of residual functional capacity." *Id.* at 1269, n2. Correspondingly, the Tenth Circuit explained that the court's function is not to compare the ALJ's findings to a physician's "notations of moderate limitations," but rather, to compare the ALJ's findings to the physician's opinion. *Id.*

Under the rule in *Smith v. Colvin*, the ALJ's RFC finding in the present case accounts for the moderate limitations identified by Dr. Walker and conforms to his RFC opinion. Therefore, the undersigned recommends that the presiding judge also deny this claim.

### D.  The ALJ Did Not Improperly Evaluate the Testimony of Plaintiff's Wife

Plaintiff contends in his fourth allegation of error that the ALJ did not properly evaluate the testimony given by his wife. He asserts that "ALJ Farris did not make specific credibility findings in terms of the third party function report and hearing testimony." Pl.'s Mot. 18 (emphasis omitted). Moreover, he alleges that the ALJ did not assess whether Plaintiff's "learning disability affects his ability to perform work-life activities, as was reported by [his wife]." *Id.* (citing AR 66-71).

Social Security Ruling 06-03p provides the standards for evaluation of third-party evidence, including third-party function reports and testimony from spouses, parents, friends, and neighbors. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). The Ruling directs ALJs to consider the following factors: (i) the nature and extent of the relationship; (ii) whether the evidence is consistent with other evidence; and (iii) any other factors that tend to support or refute the evidence. *Id.*, at *6. However, specific written findings about each lay witness's credibility are not necessarily required, particularly where the ALJ's written decision reflects that she considered the evidence. *See Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996). Here, the ALJ specifically referenced in her decision both the third-party function report of Plaintiff's wife as well as her testimony. *See* AR 28 (discussing wife's third-party function report); AR 30, 34 (discussing wife's testimony). Thus, she clearly considered the evidence. A specific credibility determination is also not required for lay witness statements that are largely cumulative of other evidence that was discussed. *See Brescia v. Astrue*, 287 F. App'x 626, 630 (10th Cir. 2008)

(unpublished).   Here, Plaintiff's wife's testimony is generally cumulative to Plaintiff's own testimony and written statements,[10] which the ALJ properly found not entirely credible.  *See* AR 31.   Moreover, the Tenth Circuit has declined to remand for an error in an ALJ's credibility determination where "the balance of the ALJ's credibility analysis is supported by substantial evidence in the record." *Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004). The ALJ provided numerous reasons, supported by the record, to discount the credibility of Plaintiff's alleged symptoms.[11] Therefore, the Court finds any error in the credibility findings as to Plaintiff's wife to be harmless and recommends that the presiding judge deny this claim.

### E.  The ALJ's Step Five Finding Is Not Supported by Substantial Evidence

Lastly, Plaintiff contends that the ALJ's step five findings are not supported by substantial evidence.   He frames the challenge by noting that, at step five of the sequential evaluation, the Commissioner carries the burden "to prove that a claimant retains a sufficient RFC to perform other jobs existing in significant numbers in the national economy."  Pl.'s Mot. 20.   By Plaintiff's assessment, "the number of jobs provided by VE Weber under the OES 'groupings' do not correlate to the hypothetical propounded by [the ALJ]," and the "total of 2[,]176 jobs available in the national economy does not rise to the significant level as defined in 42 U.S.C. § 423(d)(2)(A)."  *Id.* at 21.   Consequently, he posits, "the number of jobs in this case is so borderline that remand is required for the more searching inquiry suggested by *Trimiar* in doubtful cases."  *Id.* (citing *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) (providing

---

[10] This should come as no surprise, as Plaintiff's wife completed the forms on Plaintiff's behalf.  *See* AR 234-41; 253-60.

[11] At the time of her decision, SSR 96-7p required that the ALJ assess the credibility of Plaintiff's statements about his symptoms.  *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996).  SSR 96-7 has since been superseded by SSR 16-3p, which no longer requires a credibility assessment.  *See* SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016) ("[W]e are eliminating the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.").

the following factors to consider at step five in determining whether work exists in significant numbers: (1) the level of claimant's disability; (2) the reliability of the vocational expert's testimony; (3) the distance claimant is capable of travelling to engage in the assigned work; (4) the isolated nature of the jobs; and (5) the types and availability of such work)).

The Commissioner replies that "remand is not necessary because consideration of the *Trimiar* factors provides support for the ALJ's finding that Plaintiff could perform a significant number of jobs." Def.'s Resp. 6. She then performs her own *Trimiar* analysis, claiming "there is little evidence in the record to support Plaintiff's claims of disabling physical impairments, and Plaintiff was able to work for years despite his inability to read or write and his learning disability." *Id.* She alleges that "[i]t is quite likely that Plaintiff's failure to secure a job [during the time he claimed to be disabled] was due to his continued drug use and prior felony conviction rather than physical or mental impairments." *Id.* at 6-7. She further states there is no evidence that the VE's testimony is unreliable, that Plaintiff is unable to travel for work, or that the jobs identified by the VE are isolated or unusual. *Id.* at 7. The Commissioner then closes by providing numerous nationwide citations to support her contention that "courts have upheld cases in which very few jobs were identified in the national or regional economies, and Plaintiff has provided this Court with no legal basis to find otherwise in this case." *Id.*

At its core, this claim arises from the testimony of VE Weber, who testified that someone with Plaintiff's assigned RFC could perform three separate jobs. *See* AR 72-73. The first she identified was "garment bagger," Dictionary of Occupational Titles ("DOT")[12] number 920.687-018. She stated, "[w]ithin the national economy there are 529,197 full time jobs the - - with the DOT number itself for garment bagger, there are 833 nationally." AR 73 (emphasis in original).

---

[12] The DOT includes information about jobs (classified by their exertional and skill requirements) that exist in the national economy. 20 C.F.R. § 220.134 (2016). Regulations require the Commissioner to take administrative notice of job information provided by the DOT. 20 C.F.R. § 404.1566 (2016).

She then advanced the position of "garment folder," DOT number 789.687-066. She observed, "[w]ithin the national economy there are 394,200 jobs that are at the full time level and there are 1,290 jobs that are listed as being part of the <u>DOT</u>." AR 73 (emphasis in original). Lastly, she suggested that Plaintiff could work as a "cleaner and polisher of metal products." AR 73. As to this occupation, she reasoned that "[w]ithin the national economy there are 419,000 full time jobs . . . and within the actual <u>DOT</u> there are 53." AR 73-74 (emphasis in original). In sum, between the three jobs, the VE testified that there were 1,342,397 "full time" jobs available to Plaintiff within the national economy, and 2,176 jobs available nationally to Plaintiff within the "actual" DOT numbers. *See* AR 73-74.

The VE's bifurcation between full time national jobs and jobs within an "actual" DOT represents a peculiar break from the customary terminology in these cases. Unfortunately, the ALJ further complicated this claim when she transposed the VE's testimony to her findings. There, the ALJ divided the numbers related to her by the VE into jobs in "the OES grouping"[13] and "jobs in the national economy within the specific D.O.T. number" as follows:

> Garment Bagger (D.O.T. Code 920.687-018); unskilled (SVP of l); 529,197 jobs in the OES grouping and 833 jobs in the national economy within the specific D.O.T. number;

> Garment Folder (D.O.T. Code 789.687-066); unskilled (SVP of 2); 394,200 jobs in the OES grouping and 1,290 jobs in the national economy within the specific D.O.T. number; and

---

[13] The Occupational Employment Statistics ("OES") Survey is a federal-state cooperative program between the U.S. Department of Labor's Bureau of Labor Statistics and the state workforce agencies that provides national occupational employment and wage rate estimates. *See Anders v. Colvin*, No. 2:14-CV-00610-EJF, 2015 WL 5555745, at *13 (D. Utah Sept. 18, 2015) (unpublished) (citation and internal quotation marks omitted); *Guidry v. Astrue*, No. 08-CV-01846-PAB, 2009 WL 4884282, at *5 (D. Colo. Dec. 10, 2009) (unpublished). Job data in the OES naturally varies from the DOT, as the OES classifies jobs by census codes rather than DOT codes. *McDonald v. Colvin*, No. CIV-14-220-SPS, 2015 WL 5749392, at *2 (E.D. Okla. Sept. 30, 2015) (unpublished). Furthermore, unlike figures derived from the DOT, regulations do not require the Commissioner to take administrative notice of OES statistics. *See* 20 C.F.R. § 404.1566.

Cleaner and Polisher (Metal Products) (D.O.T. Code 709.687-010); unskilled (SVP of 2); 419,000 jobs in the OES grouping and 53 jobs in the national economy within the specific D.O.T. number.

AR 36. This nomenclature also deviates from the mean in cases filed in the district courts across the Tenth Circuit, where both the ALJ and the reviewing court typically rely on VE testimony about two categories of jobs: (1) those existing in the national economy, and (2) those existing in the regional economy or the state of filing. *See, e.g.,* Order, Sep. 29, 2016, Doc. No. 25, at 30, *Ryan v. Colvin*, Civ. No. 15-740 KBM (D.N.M. filed Aug. 24, 2015) (unpublished) (describing VE testimony on jobs in the national economy and regional economy); *Pursley v. Colvin*, No. CIV-15-276-SPS, 2016 WL 5408154, at *2 (E.D. Okla. Sept. 28, 2016) (unpublished) (noting ALJ's finding that claimant could perform other work in the regional or national economy); *Kummer v. Colvin*, No. 2:15-CV-00318-DBP, 2016 WL 4691588, at *5 (D. Utah Sept. 7, 2016) (unpublished) (discussing VE testimony of positions available nationally and regionally); *Wright v. Colvin*, No. CIV-15-558-BMJ, 2016 WL 4077244, at *2 (W.D. Okla. July 29, 2016) (noting the ALJ's reliance on VE testimony to find jobs existed in significant numbers in the regional and national economies). The focus on jobs in *either* the national economy or regional economy is a reflection of unique Tenth Circuit case law, which allows an ALJ to make step five findings based on a determination of whether work exists in significant numbers in the regional *or* national economy, while still acknowledging "that the controlling statutes, federal regulations, and case law all indicate that the proper focus generally must be on jobs in the national, not regional, economy" *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).

Nonetheless, the VE and ALJ's decision to eschew traditional terminology does not constitute the most confounding aspect of the ALJ's error. To the contrary, it is the drastically divergent numbers given by the VE to the ALJ, which the ALJ subsequently incorporated into

her decision, which compel remand.  Indeed, each of the three job types described by the VE –

garment bagger, garment folder, and metal cleaner/polisher - have appeared previously in cases

within the District of New Mexico, and in each, the testimony concerning the relevant number of

jobs differed considerably from those given by the VE and ALJ here.  In a 2013 decision, U.S.

Magistrate Judge William P. Lynch discussed a VE's testimony concerning the profession of

garment bagger, which the VE testified represented 467,010 jobs in the national economy, and

1,110 jobs in the regional (State of New Mexico) economy.  *See* Order, Feb. 11, 2013, Doc. No.

27, at 10, *Franco v. Colvin*, Civ. No. 12-819 WPL (D.N.M. filed July 27, 2012) (unpublished).

Later that year, Judge Lynch also had occasion to discuss a VE's testimony concerning the

profession of garment folder, which the VE testified represented 433,370 jobs in the national

economy, and 1,650 jobs in the regional (State of New Mexico) economy.  Order, May 8, 2013,

Doc. No. 25, at 11, *Cuhna v. Colvin*, Civ. No. 12-1115 WPL (D.N.M. filed Oct. 26, 2012)

(unpublished).  Also, in 2013, U.S. Magistrate Judge Carmen E. Garza ruled on a case involving

a VE's testimony concerning a metal cleaner/polisher, and there, the VE testified that there were

250,000 of these jobs in the national economy and 1,000 jobs in the region.  Order, Nov. 15,

2013, Doc. No. 19, at 37, *Covert v. Colvin*, Civ. No. 12-1221 CG (D.N.M. filed Nov. 17, 2012)

(unpublished).  Clearly, these numbers, which represent only a sampling from within this district,

contrast sharply with the VE's testimony in this case.  The odd phrasing of both the VE and the

ALJ only serve to further reinforce that their numbers are almost certainly erroneous.

Hence, this Court must attempt to meaningfully review a record which the ALJ failed to

properly develop, in contravention of her duty.  *See Hawkins v. Chater*, 113 F.3d 1162, 1164

(10th Cir. 1997) (holding that "the ALJ is responsible in every case to ensure that an adequate

record is developed during the disability hearing consistent with the issues raised") (citation and

internal quotation marks omitted).  That record, as it stands, reflects that only 2,176 jobs are available to Plaintiff in the national economy.  *See* AR 36, 73-74.  Although the Commissioner offers a litany of citations to persuade this Court that "courts have upheld cases in which very few jobs were identified in the national *or* regional economies," each case cited by the Commissioner, with one exception, was resolved *exclusively* on the number of jobs in the regional economy.  *See* Def.'s Resp. 7 (citing *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (finding 4,000 jobs in the Milwaukee metropolitan area significant); *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (finding 1,400 jobs in the Milwaukee metropolitan area significant); *Hall v. Bowen*, 837 F.2d 272, 273-75 (6th Cir. 1988) (finding 1,350 jobs in the nine-county area including Dayton, Ohio, to be significant); *Barker v. Secretary of Health and Human Services*, 882 F.2d 1474, 1479 (9th Cir. 1989) (finding 1,266 jobs in the Greater Metropolitan Los Angeles and Orange County area significant); *Trimiar*, 966 F.2d at 1330-32 (finding 650 to 900 jobs in the State of Oklahoma significant); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (finding 500 jobs in the region which the claimant lived significant); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (finding 1,600 jobs in the State of Georgia and 80,000 in the national economy significant); *Nix v. Sullivan*, 744 F.Supp. 855, 863 (N.D. Ill. 1990) (finding 675 jobs in the regional area significant), *aff'd*, 936 F.2d 575 (7th Cir. 1991)).  *Allen v. Bowen* represents the single case proffered by the Commissioner that was at least tangentially decided on the basis of jobs in the national economy, and in *Allen*, the court relied on the VE's finding of 80,000 jobs in the national economy.  *See* 816 F.2d at 602-03.  Thus, the Commissioner's authorities do little to advance her argument.

Where a claimant demonstrates an inability to perform any past work, "the ALJ bears the burden at step five to show that there are jobs in the regional or national economies that the

claimant can perform with the limitations the ALJ has found him to have." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999).  By relying on and incorporating the incongruent testimony of the VE, the ALJ has failed to meet that burden.  While harmless error is generally applicable in reviewing a Social Security decision, the Tenth Circuit has cautioned courts against "usurping the administrative tribunal's responsibility to find the facts" or impermissibly providing *post hoc* justification that rests on legal or evidentiary matters not considered by the ALJ.  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

In *Allen*, the Tenth Circuit found that the ALJ erred in determining the number of available jobs that the claimant could perform in light of his RFC and the VE's testimony.  *Id.* at 1143-44.   In refusing to find the error harmless, the court emphasized that because the ALJ had based his conclusion that the claimant could perform a significant number of jobs in the national economy on erroneous figures, "[a]ny attempt to save the decision . . . usurps the ALJ's primary responsibility to determine that question in light of [ ] various case-specific considerations."  *Id.* at 1145.

Under binding precedent, this Court cannot attempt to save the ALJ's decision by interlineating into it more accurate numbers for the three job categories in question.  The ALJ is bound by her finding of only 2,176 jobs available to Plaintiff in the national economy, AR 36, and whether this number is "significant" is far from settled as a matter of law. *Compare, e.g.*, *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (implying that 11,000 national jobs is a significant number) (unpublished), *with Chavez v. Barnhart*, 126 F. App'x 434, 436 (10th Cir. 2005) (unpublished) (declining to find harmless error when, after excluding some jobs the ALJ had improperly identified, there remained 199 regional and 49,957 national jobs the claimant could still perform).  Although the *Trimiar* court declined to announce "a bright line" number of

jobs in either the national or regional economy that would satisfy the Commissioner's burden, *see* 966 F.2d at 1330, the number currently before the Court almost certainly falls short. For that reason, the Court finds the ALJ's step five decision to be unsupported by substantial evidence. Accordingly, this case must be remanded to the ALJ to either further develop the record relating to the number of jobs available to Plaintiff in the national economy, or if she accepts the figures originally propounded by VE Weber, to perform a more thorough examination of whether VE Weber's numbers represent significant numbers in the national economy using the Tenth Circuit's *Trimiar* factors. The undersigned recommends that the presiding judge remand the instant matter for proceedings limited to the resolution of the issues identified in this section.

## VI.     CONCLUSION

**IT IS THEREFORE RECOMMENDED** that Plaintiff's Motion to Reverse or Remand [Doc. No. 17] be **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER RECOMMENDED** that the Commissioner's final decision be **REMANDED** for the limited purpose of resolving the step five issues identified herein.

**IT IS FURTHER RECOMMENDED** that Plaintiff's Motion be **DENIED** in all other respects.

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**